# UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLUMBIA

**WINDER HMA LLC,** *et al.*,

     **Plaintiffs,**

     **v.**

         **Civil Action No. 14-2021 (JEB)**

**SYLVIA BURWELL,**

     **Defendant.**

## MEMORANDUM OPINION

Hospitals participating in the Medicare program are reimbursed by the federal government each year for much of the cost of the services they provide to qualifying patients. The Medicare patients themselves, however, are responsible for a small share of the cost of their care – *e.g.*, deductibles or co-payments – just as non-Medicare patients are.  When patients of both types fail to pay their portion of the bill, hospitals are forced to engage in collection efforts to recover the money due. If hospitals are ultimately unable to recover the amounts owed by Medicare patients, the Medicare program will reimburse them for this sum.  To avoid token collection efforts, however, Medicare regulations require that hospitals treat Medicare and non-Medicare debts in the same manner.

In this case a group of hospitals challenges a decision by the Secretary of Health and Human Services not to reimburse them for some Medicare patients' unpaid debts because they did not expend precisely identical efforts collecting Medicare debts as they did collecting non-Medicare debts.  As in other Medicare-reimbursement cases, "[w]hat begins as a rather conventional accounting problem raises significant questions respecting the interpretation of the

Secretary's regulations," the agency's interpretive guidance, and the Medicare statutes themselves.  See Shalala v. Guernsey Mem'l Hosp., 514 U.S. 87, 89-90 (1995).  At issue here is a statute known as the Bad Debt Moratorium, which freezes in place some of the Secretary's Medicare-reimbursement policies as they existed on August 1, 1987.  As the Court concludes that the Secretary's present understanding of one section of her interpretive guidance is inconsistent with her 1987 interpretation, it will vacate the agency's reimbursement denial and remand for further administrative proceedings.

## I.      Background

Because the Medicare statute and its attendant regulations and interpretive guidance create a complex scheme that governs the actions taking place in this case, the Court will first set forth the basic contours of that scheme and then examine the administrative proceedings that gave rise to Plaintiffs' suit.

### A.  Statutory Background

#### 1.  *Overview*

"The federal Medicare program reimburses medical providers for services they supply to eligible patients," who are typically elderly or disabled.  See Ne. Hosp. Corp. v. Sebelius, 657 F.3d 1, 2 (D.C. Cir. 2011) (citing 42 U.S.C § 1395 *et seq.*).  Part A, the section of the statute relevant here, "covers medical services furnished by hospitals and other institutional care providers."  Id.  The Center for Medicare and Medicaid Services (CMS), a component of the Department of Health and Human Services, administers the Medicare-reimbursement program.  See Arkansas Dep't of Health and Human Servs. v. Ahlborn, 547 U.S. 268, 275 (2006).

To receive their Medicare Part A reimbursements, "[a]t the end of each year, providers participating in Medicare submit cost reports to contractors acting on behalf of HHS known as

fiscal intermediaries."  Sebelius v. Auburn Regional Medical Center, 133 S. Ct. 817, 822

(2013); see also 42 C.F.R. §§ 413.20, 413.24.  These intermediaries, typically private companies

that "process payments on behalf of CMS[ and] make interim payments to providers, . . . then

analyze and audit the cost report and inform the provider of the total amount of Medicare

reimbursement to which they are entitled, which is referred to as the Notice of Program

Reimbursement (NPR)."  Emanuel Medical Center, Inc. v. Sebelius, 37 F. Supp. 3d 348, 350

(D.D.C. 2014) (citing 42 C.F.R. § 405.1803).  A provider dissatisfied with the intermediary's

determination of its NPR is afforded 180 days to request a hearing to challenge that

determination before the Provider Reimbursement Review Board (PRRB).  See 42 U.S.C. §

1395oo(a).  "The Board can affirm, modify, or reverse the fiscal intermediary's award; the

Secretary [of HHS] in turn may affirm, modify, or reverse the PRRB's decision."  Emanuel

Medical Center, 37 F. Supp. 3d at 350 (citing 42 U.S.C. §§ 1395oo(d)-(f)).  The provider then

has sixty days after notice of a final decision by the PRRB or the Secretary in which to file a civil

action in federal district court to seek judicial review of that decision.  See 42 U.S.C. §

1395oo(f); 42 C.F.R. § 405.1877.

       2. *Reimbursement of "Bad Debts"*

"Although the costs incurred for most of the care provided to Medicare patients are borne

by the government, individual Medicare patients are often responsible for both deductible and

coinsurance payments for hospital care."  Cmty. Health Sys., Inc. v. Burwell, 113 F. Supp. 3d

197, 203-04 (D.D.C. 2015) (internal quotation marks and citation omitted).  When Medicare

patients fail to pay this portion of their care, hospitals may, under certain conditions, write such

payments off as "bad debt" and seek reimbursement from the federal government.  See 42 C.F.R

§ 413.89(e).  As another court in this district has explained, "The principle underlying the

reimbursement of Medicare bad debt is straightforward: 'This policy, adopted in 1966[,] ... was originally intended to prevent costs of beneficiary care from being shifted to non-Medicare patients,'" sometimes referred to as the "statutory cross-subsidization ban." Cmty. Health Sys., Inc., 113 F. Supp. 3d at 204; 42 U.S.C. § 1395x(v)(1)(A)(i) (stating that "the necessary costs of efficiently delivering covered services to individuals covered by" Medicare "will not be borne by individuals not so covered").

Medicare "bad debts" are defined as "amounts considered to be uncollectible from accounts and notes receivable that were created or acquired in providing services" and are "attributable to the deductibles and coinsurance amounts" billed by providers to individual Medicare patients. See 42 C.F.R. §§ 413.89(b)(1), 413.89(a). When hospitals submit Medicare bad debt for reimbursement, they must demonstrate that the debt satisfies four criteria, set forth in longstanding regulations:

> (1) The debt must be related to covered services and derived from deductible and coinsurance amounts.
> (2) The provider must be able to establish that reasonable collection efforts were made.
> (3) The debt was actually uncollectible when claimed as worthless.
> (4) Sound business judgment established that there was no likelihood of recovery at any time in the future.

42 C.F.R. § 413.89(e). HHS has provided further interpretive instruction as to the meaning of "reasonable collection efforts" in its Provider Reimbursement Manual (PRM). See ECF No. 19 (Cross-Mot.) at 35 (Def. Exh. 1). PRM § 310 instructs:

> To be considered a reasonable collection effort, a provider's effort to collect Medicare deductible and coinsurance amounts must be similar to the effort the provider puts forth to collect comparable amounts from non-Medicare patients. It must involve the issuance of a bill on or shortly after discharge or death of the beneficiary to the party responsible for the patient's personal financial obligations. It also includes other actions such as subsequent billings, collection

> letters and telephone calls or personal contacts with this party which constitute a genuine, rather than a token, collection effort.

Def. Exh. 1 at 2 (emphasis added). The PRM further states that a reasonable collection effort may – but need not – involve referral of unpaid amounts to a collection agency:

> A provider's collection effort may include the use of a collection agency in addition to or in lieu of subsequent billings, follow-up letters, telephone and personal contacts. Where a collection agency is used, Medicare expects the provider to refer all uncollected patient charges of like amount to the agency without regard to class of patient. . . . Therefore, if a provider refers to a collection agency its uncollected non-Medicare patient charges which in amount are comparable to the individual Medicare deductible and coinsurance amounts due the provider from its Medicare patient, Medicare requires the provider to also refer its uncollected Medicare deductible and coinsurance amounts to the collection agency.

Id. at 2-3 (PRM § 310(A)). The same section of the manual sets forth a "[p]resumption of [n]oncollectibility," according to which debts are deemed uncollectible "[i]f after reasonable and customary attempts to collect a bill, the debt remains unpaid more than 120 days from the date the first bill is mailed to the beneficiary." Id. at 3 (PRM § 310.2).

       3. *Bad Debt Moratorium*

While the repayment of bad debts to hospitals has been a longstanding practice under the Medicare program, resulting in "the government['s] . . . reimburs[ing] a substantial percentage of Medicare bad debt incurred by providers," Cmty. Health Sys. Inc., 113 F. Supp. 3d at 205, "[b]y the mid-1980s . . . elimination or radical alteration of this practice became the subject of policy debates," as critics complained that hospitals profited unduly under the Medicare-reimbursement system. See id. The 1983 Social Security Act amendments had shifted payments to service providers from direct reimbursement for the cost of treating Medicare patients to "a fixed cost per diagnosis, allowing hospitals to turn a profit on what had previously been a zero sum game." Id. As a result, the agency began examining whether "the original intent of reimbursing

hospitals for bad debts no longer seems appropriate." Id. (quoting HHS 1986 OIG Report at 3).

HHS recommended that Congress make changes to this system, but such recommendations "met

with resistance in Congress and within the health care industry," id. at 206, so shortly after the

agency issued its recommendations, Congress took legislative action to "shield Medicare

providers from the [HHS] Inspector General's proposed policy changes." Foothill Hosp. Morris

L. Johnston Mem'l v. Leavitt, 558 F. Supp. 2d 1, 3 (D.D.C. 2008). This action was part of the

Omnibus Budget Reconciliation Act of 1987. See Pub. L. 100-203 § 4008(c), 101 Stat. 1330,

1355 (1987); see also Hennepin Cnty. Med. Ctr. v. Shalala, 81 F.3d 743, 745 (8th Cir. 1996)

(explaining that Congress enacted these provisions in response to the policy proposals of the

Office of the Inspector General of HHS). Congress enacted additional, related amendments in

1988 and 1989, and together these legislative provisions became known as the "Medicare Bad

Debt Moratorium." See Technical and Miscellaneous Revenue Act of 1988, Pub. L. No. 100-

647 § 8402, 102 Stat. 3342, 3798 (1988); Omnibus Budget Reconciliation Act of 1988, Pub. L.

No. 101-239 § 6023, 103 Stat. 2106, 2167 (1989). Instead of amending existing regulations

concerning the reimbursement of bad debt, the Moratorium froze in place the Secretary's

interpretations of those regulations as they existed on August 1, 1987.

The Bad Debt Moratorium mandated:

> In making payments to hospitals under [the Medicare program], the
> Secretary of Health and Human Services shall not make any change
> in the policy in effect on August 1, 1987, with respect to payment
> under [the Medicare program] to providers of service for reasonable
> costs relating to unrecovered costs associated with unpaid
> deductible and coinsurance amounts incurred under [the Medicare
> program] (including the criteria for what constitutes a reasonable
> collection effort).

101 Stat. 1330-55 (emphasis added). The 1989 amendment added the following sentence: "The

Secretary may not require a hospital to change its bad debt collection policy if a fiscal

intermediary, in accordance with the rules in effect as of August 1, 1987, . . . has accepted such policy before that date. . . ." 103 Stat. 2106. The Bad Debt Moratorium, thus amended, imposes a two-pronged restriction on the Secretary: "First, the Secretary is prohibited from making any changes to the agency's bad debt policy in effect on August 1, 1987. Second, the Secretary is prohibited from requiring a provider to change bad debt policies it had in place on August 1, 1987." Dist. Hosp. Partners, L.P. v. Sebelius, 932 F. Supp. 2d 194, 198 (D.D.C. 2013) (internal citations omitted). With this statutory background in mind, the Court now turns to Plaintiffs' challenge to their Medicare reimbursements and the attendant administrative proceedings.

B. Plaintiffs' Medicare Reimbursements

1. *The Hospitals' Collection Efforts*

Plaintiffs in this case are Health Management Associates, Inc., Community Health Systems, Inc., and their subsidiaries, all of whom are operators of various hospital facilities in multiple states that provide acute-care services as part of the Medicare program. See Mot. at 8 (Pl. SOF, ¶ 3.1); AR 14. (The Court, following Plaintiffs' practice, will refer to all of them collectively as "the Hospitals.") The central issue this suit raises concerns the Hospitals' efforts to collect outstanding debts from Medicare patients before writing them off as "bad debts" and whether those efforts were sufficient.

During the period at issue in this case – fiscal years ending in 2004, 2005, and 2006 – the Hospitals employed a variety of procedures in attempting to collect unpaid deductibles and other payments owed by Medicare patients, which efforts began once the insurers (Medicare or additional insurance providers) had satisfied their obligations. See Mot. at 9 (Pl. SOF, ¶ 3.2). The Hospitals first "maintained a substantial in-house collection process," contracting with the private Artrac Corporation to engage in "first party" collections in the name of the Hospitals.

See id. As part of that process, the Hospitals first sent a letter to the patient advising him of his financial obligations for medical services provided and followed up with additional collection letters to the patient or relevant payer. Id. Meanwhile, Artrac, using its predictive-dialing system, made calls to these patients "at least once every 7-10 days." Id. These calls were made at different times of the day and on different days of the week. Id. If accounts still remained unpaid after these efforts, Artrac would send "a final demand letter" and then return the accounts to the Hospitals, which would then send all of the unpaid accounts – both Medicare and non-Medicare – to an outside collection agency (OCA). Id. at 9-10 (Pl. SOF ¶ 3.2).

The OCA's practices were more aggressive, sending patients no fewer than three letters making at least twelve calls, and also utilizing litigation where appropriate. Id. The Hospitals explained that, together with the outside collection agency, its collection efforts included:

1. Repeated review of the accounts to determine whether the debtors were bankrupt or deceased;
2. Repeated verification of both the debtors' addresses and phone numbers;
3. Issuance of numerous collection letters demanding payment;
4. Frequent phone calls at all times of the day and in the evening;
5. Reporting of the debts on the debtor's credit reports; and
6. [Pursuing or r]uling out of legal action.

AR 15. These in-house and outside-agency collection efforts extended for more than 120 days for all accounts. See AR 15; AR 179 (Providers' opening argument, contending that their primary collection efforts lasted "for approximately 150 to 250 days for both [their] Medicare and non-Medicare accounts"). After this time, the OCA, which was paid on a contingency basis, would review each account and determine whether it was uncollectible. See AR 250-51. If so, the OCA would send the account back to the Hospitals, which would then write it off as "bad debt." See id. at 254. If the OCA determined that there was still some likelihood of collection, however, it would retain the account so long as such possibility existed. See id. at 250-51.

Once the Hospitals had written off the accounts, they coded Medicare bad debt as "985" and non-Medicare bad debt as "978." Mot. at 11 (Pl. SOF ¶ 3.3). After the write-off process, the Hospitals elected to send only their <u>non</u>-Medicare bad debts to a secondary collection agency (SCA). They argued before the PRRB that they believed, at the time that all the accounts were written off, that their primary collection activities constituted "reasonable collection efforts" as described by 42 C.F.R. § 413.89(e) and PRM § 310. <u>See</u> AR 15. They contended that at the time they finished their primary collection efforts, "there really was no likelihood of collection in the future on the accounts" in their "sound business judgment. . . based upon the determination that if the debtor had not paid by that point, after those collection efforts, he or she was not going to pay." AR 182. The Hospitals therefore concluded that the Medicare bad debts were, at that point, eligible for reimbursement from CMS and took no further action to collect them. They nevertheless sent the "978" non-Medicare bad debts to the SCA to "warehouse the claims," even though those accounts "continued to be valued as worthless." Mot. at 12 (Pl. SOF ¶ 3.4).

A brief explanation of how the non-Medicare debts were processed by the secondary collection agency may aid the reader. Sometimes, the secondary collection agency would be the same agency as the primary collection agency, but would charge a higher contingency fee for accounts collected via secondary collection (30% versus 15%, for example). <u>See</u> AR 252. The SCA's primary activity, however, was credit reporting, which does not involve agency communication with the patient. <u>Id.</u> For that reason, at least one SCA representative testified before the PRRB that it did not consider SCA's work to constitute "collection activities." <u>Id.</u> ("We're not attempting to collect. We're just doing our duty of keeping the patients['] record . . . updated, their credit record updated."). The SCAs determined whether a patient associated with an account was deceased, had changed his address, or had filed for bankruptcy. <u>Id.</u> It then sent a

notice to the debtor to inform him that his account had been forwarded to the SCA.  <u>See</u> AR 253.

The SCA would try, via two or three calls, to contact the patient; if those attempts were

unsuccessful – one SCA representative testified that it was "very unlikely that we would get

paid" as a result of such calls, <u>id.</u> – the SCA would report the account to the credit bureau.  <u>See</u>

AR 15.  After that time, the accounts remained with the SCA indefinitely, unless or until

payment was made as a result of some unforeseen life change.  <u>See</u> AR 253.  The SCAs differed

from the OCAs, then, in that their attempts to contact the patient were minimal, and they did not

engage in litigation or other efforts to collect the unpaid debt.  <u>Id.</u>

   2.  *Intermediary's Disallowance*

  Plaintiffs' designated Intermediary was the Mutual of Omaha Insurance Company.  <u>See</u>

AR 14.  According to the Hospitals, they had for years been employing this practice of sending

only non-Medicare bad debts to SCAs after writing them off as uncollectible.  <u>See</u> Mot. at 13 (Pl.

SOF ¶ 3.4).  Further, Plaintiffs insist that the Intermediary had "allowed most of the claimed bad

debts" under this practice for years prior to the fiscal years in this dispute.  <u>See</u> Mot. at 13 (Pl.

SOF ¶ 3.5.1); <u>see also</u> AR 223 (Hospital representative's testimony that "[i]n 2006, all of the

sudden . . .[w]e were being told that we weren't following exact collection efforts").

  In any event, the Intermediary's 2006 audit – reviewing accounts written off for FYE

2004 – concluded that the Hospitals' Medicare bad debts should be disallowed because they had

not been sent to the SCA, as the non-Medicare accounts had.  <u>See</u> Mot. at 14 (Pl. SOF ¶ 3.5.2);

AR 1136-39 (Lower Keys Medical Center Medicare Bad Debts Audit); AR 568-570

(Intermediary "Management Letters" to Hospitals).  The Hospitals appealed these disallowances

to the Provider Reimbursement Review Board and requested a hearing.  <u>See, e.g.</u>, AR 2634,

2638.

3. *PRRB Decision*

Following briefing and a two-part hearing conducted on September 26 and November 19, 2013, the PRRB issued findings of fact and conclusions of law on September 25, 2014. See AR 10-30 (PRRB Decision). The Board focused on the question of whether the Hospitals' decision to send only non-Medicare accounts to an SCA rendered the Medicare accounts written off in those years non-reimbursable. It began by noting that "[i]t is undisputed that the Providers treated Medicare accounts and non-Medicare accounts in a similar manner during in-house and primary collection agency efforts[, which] were expended for more than 120 days." PRRB Dec. at 9. The Board did not, however, buy the Providers' argument that, at this point, "the collection process was complete" because it found that "the intent of the SCA was to collect additional amounts of accounts receivable." Id. It concluded that "the dissimilar use of the SCA for non-Medicare versus Medicare patient accounts violates PRM [] § 310[,] making the Providers' collection process unreasonable," in violation of 42 C.F.R. § 413.89(e). Id.

In arriving at this conclusion, the Board explained that the Presumption of Noncollectibility found in PRM § 310.2 – according to which debts are deemed uncollectible if they remain unpaid for more than 120 days of reasonable and customary attempts to collect them – did not alter the outcome in this case, even though the Hospitals' primary collection efforts had exceeded 120 days for all non-Medicare and Medicare accounts. The Board reasoned that "this presumption by its own terms is only applicable to a debt 'after reasonable and customary attempts to collect a bill," and "the Providers had not completed their customary collection efforts because, on its face, the Providers' collection policy required both Medicare and non-Medicare accounts to be sent to the SCA." PRRB Dec. at 10 (quoting testimony stating that Hospitals' bad-debt collection policy was, "If no action is taken the system will generate a 978

11

adjustment for all non-Medicare accounts, 985 for Medicare accounts, and transmit the account to the secondary collection agency."). The PRRB then turned to the Bad Debt Moratorium and discussed its two prongs at length.

The Board explained that its decision did not violate the first prong of the Moratorium, which prohibits CMS from changing its bad-debt policy in effect on August 1, 1987, because Section 310 of the Provider Reimbursement Manual existed in the same form in 1987. See PRRB Dec. at 12. Section 310, the Board stated, made clear that "regardless of where the provider sets the bar for its actual 'collection effort[,]' § 310 specifies that, in order for a collection effort to be considered reasonable, the provider's actual 'collection effort' for Medicare accounts must be similar to that used for non-Medicare accounts," and there must be "consistency in this treatment across" both forms of accounts. Id. The Board thereby adopted a rigid interpretation of PRM § 310 – requiring that collection efforts be exactly the same for non-Medicare and Medicare accounts – rather than a more flexible interpretation, permitting exceptions to the similar-collection-efforts standard where sound business judgment counseled against identical treatment. As the reader will soon learn, the Board's understanding of Section 310 is the central disputed issue in this case.

The Board's decision also discussed the Manual's Presumption of Noncollectibility, pointing to decisions prior to 1987 that demonstrated that a 120-day collection effort was not sufficient to trigger the presumption if the provider could not demonstrate that during those 120 days it had completed its customary collection efforts. See id. at 15-16. In particular, the Board found that if "the Providers chose to utilize the SCA as part of their 'customary collection effort' for non-Medicare bad debt accounts," they were required to utilize the SCA for Medicare accounts as well. Id. at 16. This requirement, in the Board's view, was bolstered by its finding

that the SCA "did engage in <u>actual</u> collection efforts" and "did result in meaningful collections as the net collection percentages for the SCA ranged from 3.5 percent to 6.5 percent." Id. The Board did "recognize[] that the Providers' decision to send only non-Medicare bad debts to the SCA may have been above and beyond the minimum needed to establish a 'reasonable collection effort.'" Id. At the same time, "the Providers' decision to incorporate use of the SCA into its customary collection efforts for non-Medicare accounts means that the SCA activities must be incorporated into the 'reasonable collection effort' standard being applied to the Providers for Medicare accounts." Id.

The Board thus determined that "the Intermediary's disallowance of the bad debts at issue is not in conflict with the first prong of the Bad Debt Moratorium." Id. Nor, the Board concluded, did the disallowance conflict with the second prong of the Moratorium, which prohibits the Secretary from requiring a hospital to change its bad-debt collection policy if a fiscal intermediary, in accordance with rules in effect on August 1, 1987, has "accepted such policy before that date." Id. at 20-21. Here, the Board found "nothing in the record showing that the Intermediary approved the Providers' policy of only sending non-Medicare bad debt accounts to a secondary collection agency." Id. at 21. Having found that the Bad Debt Moratorium posed no problem for the Intermediary's recommended disallowances, the Board affirmed them, stating that the Medicare debts the Hospitals had submitted did "not meet[ the] 'similar' collection effort requirement within the reasonable collection effort requirements." Id.

The Administrator of CMS declined to review the PRRB decision in this case. See AR 01. On November 28, 2014, the Hospitals filed this action seeking judicial review of the Board's decision and naming the Secretary of HHS, in her official capacity, as Defendant. See ECF No. 1 (Complaint). Plaintiffs moved for summary judgment in December of 2015 and Defendant

cross-moved in March of 2016.  See ECF Nos. 15 (Motion), 19 (Cross-Motion).  It is these Motions the Court now considers.

## II.     Legal Standard

Both parties here have moved for summary judgment on the administrative record.  The summary-judgment standard set forth in Federal Rule of Civil Procedure 56(c), therefore, does not apply because of the limited role of a court in reviewing the administrative record.  See Sierra Club v. Mainella, 459 F. Supp. 2d 76, 89-90 (D.D.C. 2006); see also Bloch v. Powell, 227 F. Supp. 2d 25, 30 (D.D.C. 2002), aff'd, 348 F.3d 1060 (D.C. Cir. 2003).  "[T]he function of the district court is to determine whether or not as a matter of law the evidence in the administrative record permitted the agency to make the decision it did."  Sierra Club, 459 F. Supp. 2d. at 90 (quotation marks and citation omitted).  "Summary judgment is the proper mechanism for deciding, as a matter of law, whether an agency action is supported by the administrative record and consistent with the APA standard of review."  Loma Linda Univ. Med. Ctr. v. Sebelius, 684 F. Supp. 2d 42, 52 (D.D.C. 2010) (citation omitted), aff'd, 408 Fed. App'x 383 (D.C. Cir. 2010).  The Court, therefore, should focus its review on the administrative record.  See Camp v. Pitts, 411 U.S. 138, 142 (1973) ("[T]he focal point for judicial review should be the administrative record already in existence, not some new record made initially in the reviewing court.").

Judicial review of the agency's decision in this case is governed by the Medicare statute, 42 U.S.C. § 1395oo(f)(1), which incorporates the judicial-review provisions of the APA, 5 U.S.C. § 706.  The Court, accordingly, must "hold unlawful and set aside" the agency's decision only if it is "unsupported by substantial evidence," or if it is "arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law."  5 U.S.C. § 706(2).  Under this "narrow" standard of review, "a court is not to substitute its judgment for that of the agency."  Motor

Vehicle Mfrs. Ass'n of U.S., Inc. v. State Farm Mut. Auto. Ins. Co., 463 U.S. 29, 43 (1983). Rather, the Court "will defer to the [agency's] interpretation of what [a statute] requires so long as it is 'rational and supported by the record.'" Oceana, Inc. v. Locke, 670 F.3d 1238, 1240 (D.C. Cir. 2011) (quoting C & W Fishing Co. v. Fox, 931 F.2d 1556, 1562 (D.C. Cir. 1991)).

An agency is required to "examine the relevant data and articulate a satisfactory explanation for its action." State Farm, 463 U.S. at 43. For that reason, courts "'do not defer to the agency's conclusory or unsupported suppositions,'" United Techs. Corp. v. U.S. Dep't of Def., 601 F.3d 557, 563 (D.C. Cir. 2010) (quoting McDonnell Douglas Corp. v. U.S. Dep't of the Air Force, 375 F.3d 1182, 1187 (D.C. Cir. 2004)), and "agency 'litigating positions' are not entitled to deference when they are merely [agency] counsel's '*post hoc* rationalizations' for agency action, advanced for the first time in the reviewing court." Martin v. Occupational Safety & Health Review Comm'n, 499 U.S. 144, 156 (1991). The reviewing court thus "may not supply a reasoned basis for the agency's action that the agency itself has not given." Bowman Transp., Inc. v. Arkansas-Best Freight System, Inc., 419 U.S. 281, 285-86 (1974) (citation omitted). A decision that is not fully explained may, nevertheless, be upheld "if the agency's path may reasonably be discerned." Id. at 286.

## III. Analysis

In their Motion for Summary Judgment, Plaintiffs raise a number of contentions in support of their position that their Medicare bad debts should have been reimbursed, and Defendant, in her Cross-Motion, conversely defends the PRRB decision on multiple fronts. A central issue contested by both parties is whether the Bad Debt Moratorium in some circumstances allows providers to treat Medicare and non-Medicare accounts differently, if sound business judgment counsels in favor of such differential treatment. Plaintiffs argue that

the Board's decision in the negative violates the Moratorium, and Defendant disagrees. Because the Court ultimately concludes that Plaintiffs prevail on this point, it will focus its attention there and disregard most of the remaining topics debated in the briefs. After explaining why the Hospitals' position on the Bad Debt Moratorium is correct, notwithstanding the Secretary's efforts to rebut it, the Court then considers Defendant's position that Plaintiffs are nonetheless not entitled to reimbursement because they did not follow their own written collections policy. Finding that argument meritless, the Court turns last to what remedy is appropriate in this case.

A. <u>Bad Debt Moratorium</u>

As a reminder, the first prong of the Bad Debt Moratorium prohibits the Secretary from "mak[ing] any change in the policy in effect on August 1, 1987, with respect to" bad-debt reimbursements to service providers under the Medicare statute. <u>See</u> 101 Stat. 1330-55. The parties agree that the regulation requiring providers to expend "reasonable collection efforts" before writing unpaid Medicare accounts off as bad debt, and the similar-collection-efforts standard in PRM § 310, existed in 1987 in the same form as they do now. The only question is whether the PRRB's application of the § 310 similar-collection-efforts standard in a rigid and inflexible manner in this case violates its policy that existed in August 1, 1987. <u>See</u> Mot. at 33-34. The Secretary's policy in 1987, they maintain, permitted some exceptions to this standard where sound business judgment counseled in favor of differential treatment between Medicare and non-Medicare bad debts. <u>See</u> <u>id.</u>

As noted earlier, the Provider Reimbursement Manual contains the Secretary's guidance about how she interprets Medicare regulations issued by CMS. Section 310 of the PRM explains that "[t]o be considered a reasonable collection effort, a provider's effort to collect Medicare deductible and coinsurance amounts must be similar to the effort the provider puts forth to

collect comparable amounts from non-Medicare patients."  PRM § 310 (Def. Exh. 1).  Plaintiffs point to two decisions of the PRRB that pre-date the 1987 Moratorium – one from 1985 and another from 1986 – that they believe evince that "the Secretary applied the [similar-collection-efforts] standard [in Section 310] as a <u>flexible</u> guideline on 'reasonable collection effort' that could be set aside when justified by sound business judgment."  Mot. at 34 (quoting <u>Detroit Receiving Hosp. v. Shalala</u>, 194 F.3d 1312, 1999 WL 970277, at *12 (6th Cir. 1999) (unpublished) (emphasis added)).  There is no debate, furthermore, that PRRB decisions are considered part of the Secretary's bad-debt policy.  <u>See</u> <u>Detroit Receiving Hosp.</u> at *11.  The Hospitals insist that to now adopt a <u>rigid</u> approach to the similar-collection-efforts standard would thus be a "change in the policy in effect on August 1, 1987," in contravention of the Moratorium.  <u>See</u> Mot. at 36.

The first of these two aforementioned decisions is <u>St. Francis Hosp. and Med. Ctr. v. Blue Cross Blue Shield Ass'n/Kansas Hosp Services Ass'n, Inc.</u> (<u>St. Francis</u>), PRRB Dec. No. 86-D21 (Nov. 12, 1985), <u>aff'd</u>, HCFA Adm'r Dec. (Jan. 8, 1986).  In that case, the provider, an acute-care hospital seeking reimbursements for fiscal years 1980-83, "claimed that it subjected all of its accounts receivable to a reasonable collection effort even though uncollected non-Medicare patient accounts were referred to a collection agency, while uncollected Medicare patient accounts were not."  <u>Id.</u> at 1.  St. Francis Hospital, the provider, argued that it subjected all its accounts receivable – Medicare and non – to a reasonable in-house collection effort, noting that the Medicare in-house collection effort "is at least as stringent as that for all other patients' accounts."  <u>Id.</u> at 4.  These efforts included sending a bill to a patient three days after discharge and every thirty days thereafter for six months, after which time the Medicare accounts were written off as bad debts and the non-Medicare accounts were turned over to a collection agency.

Id.  The provider explained that in fiscal years 1983 and 1984, it had also referred its Medicare accounts to a collection agency after these in-house collection efforts, but "no amounts were recovered from the Medicare beneficiaries."  Id.  Once the Intermediary's audit verified that nothing was recovered by the agencies, the provider "fe[lt] that the inability of its [collection] agency to collect in 1983 justifies its actions" for other fiscal years, "when Medicare accounts were not referred to a collection agency."  Id.

The Intermediary countered that these efforts "were not consistent" and deemed the collection efforts "not reasonable in accordance with Medicare regulations and instructions," citing 42 C.F.R. § 405.420(e).  Id. at 4-5.  (That is the regulation, once again, that sets forth the criteria for allowable bad debts, the most salient of which is the requirement that the provider expend "reasonable collection efforts" prior to writing it off.)  The Intermediary argued that the referral of only non-Medicare uncollectible accounts to an outside collection agency for further collection attempts after the in-house efforts was not reasonable.  Id. at 5.  But the Board rejected that position, finding that "substantial evidence in the record demonstrates that the provider's collection efforts for Medicare uncollectible amounts meet the reasonable effort requirements of" the Medicare regulations.  See id. at7.  Put another way, the Board determined that "[s]ince the provider had demonstrated that writing off bad debts when their pursuit would be too costly was a reasonable practice, the provider's in-house collection efforts constituted a reasonable collection effort."  Id. at 1-2.  Importantly, the Board reasoned that the Intermediary's report

> indicates that the collection efforts for Medicare and non-Medicare accounts were identical up to the point when the provider turned certain delinquent accounts over to a collection agency.  It is reasonable to write off bad debts when their pursuit would be too costly.  While not specific to the years [whose reimbursements were being challenged], the provider referred its Medicare accounts to a collection agency for the fiscal years ending 1983 and 1984, but did not recover amounts form them.  The Board finds that the provider

established that there was negligible likelihood of recovery of the
Medicare bad debts.

Id. at 7. The Board also suggested that the requirement of Section 310 that a provider refer all

uncollected patient charges of like amount to a collection agency was "not in accord with

Medicare regulations." Id. at 2.

This suggests, then, that the similar-collection-efforts standard in Section 310 was not

interpreted by the agency as a requirement that debts be treated identically, without regard to the

provider's business judgment as to whether further efforts to collect on outstanding Medicare

accounts would be reasonable. The Administrator affirmed the Board's decision in St. Francis

without addressing the similar-collection-efforts issue specifically. See HCFA Adm'r Dec. at 1

(Jan. 8, 1986) (affirming "without opinion as to" similar-collection-efforts issue).

The second case, Reed City Hosp. v. Blue Cross Blue Shield Ass'n/Blue Cross Blue

Shield of Mich. (Reed City), PRRB Dec. No. 86-D67 (Feb. 20, 1986), was similar in many

respects. In Reed, the provider, Reed City Hospital in Michigan, determined based on its

"experience with collecting bad debts . . . that the results of submitting Medicare accounts to a

collection agency would have been negligible due to the highly indigent population in its service

area." Id. at 1. Like the provider in St. Francis, Reed City Hospital first experimented with

"forwarding its delinquent Medicare patient accounts to a collection agency," but this yielded

"insignificant results." Id. The hospital did, however, continue to send its non-Medicare

accounts to a collection agency, and the Intermediary asserted that such disparate treatment

violated PRM Section 310. Id. at 3. The Intermediary noted that "there is no evidence to show

that the collection agency refused to accept Medicare," id., so Reed City could have sent both

non-Medicare and Medicare patients to the agency. The PRRB did not agree. The Board found

that Reed City's in-house collection efforts were genuine and were sufficient to constitute a

reasonable collection effort as defined by Section 310, such that the hospital's subsequent decision to send only non-Medicare delinquent accounts to a collection agency was "a sound one." Id. at 1. The Board therefore allowed those reimbursements.

Reed City, Plaintiffs argue, stands for the same proposition that St. Francis had embodied just one year prior – that is, that the similar-collections-effort standard set forth in PRM § 310 was not a hard-and-fast rule. In both cases, the Board determined that so long as the provider employed reasonable efforts to collect the Medicare debt, in accordance with 42 C.F.R. § 405.420(e)(2), if the provider's sound business judgment counseled against sending the Medicare debt to a collection agency, a flexible application of Section 310 might be appropriate. Because a flexible approach to PRM § 310 was sanctioned by the Board in 1985 and confirmed in 1986 – before August 1, 1987 – the Hospitals contend that the Bad Debt Memorandum prohibits the agency from walking back this flexible approach now. They point to a recent decision by another court in this district, Mountain States Health Alliance v. Burwell, 128 F. Supp. 3d 195 (D.D.C. 2015), in which Judge Randolph Moss held as much.

In Mountain States, the plaintiff, the owner of two acute-care hospitals in Tennessee, first engaged in in-house collection efforts for all of its accounts. See id. at 198. Accounts of all types that remained uncollected were then sent to a primary collection agency. "But to the extent that second round of efforts also failed, they adopted different approaches for Medicare and non-Medicare accounts," sending non-Medicare accounts where the patient was not bankrupt to a secondary collection agency and declaring "all of the remaining Medicare bad debt 'uncollectible' and, on that basis," seeking reimbursement under Medicare. Id. The Secretary denied reimbursement given this dissimilar treatment of non-Medicare and Medicare accounts at the secondary-collection-agency stage, which violated PRM § 310. Id. The provider sought

judicial review of that decision, and the court determined that the disallowance violated the Bad Debt Moratorium.  See id. at 212-20.  Judge Moss reasoned that "section 310 existed in its present form prior to August 1, 1987," and that the Secretary's interpretive "'policy' as a whole included administrative decisions applying section 310[]."  Id. at 213.  Those administrative decisions – including, principally, the Board's decisions in Reed City and St. Francis – demonstrated that, prior to the Moratorium, "the requirement that a provider that refers non-Medicare accounts to a collection agency also refer Medicare accounts to a collection agency was not treated by the Secretary as a hard and fast rule, but rather permitted a provider to demonstrate on a case-by-case basis that the referral of the Medicare bad debt did not make sound business sense."  Id. at 214.  Judge Moss therefore remanded to allow the providers in that case – the two acute-care hospitals – to demonstrate that its decision to refer only non-Medicare accounts to a collection agency was supported by sound business sense.  Id. at 221-22.

In arriving at his conclusion, Judge Moss drew on the analyses of the Sixth and Eighth Circuits, which have also determined that the Secretary's policy prior to the adoption of the Moratorium was not to interpret Section 310 as imposing a rigid similar-collection-efforts requirement.  Unlike Mountain States, those circuits were confronted with cases concerning the second prong of the Moratorium, which prohibits disallowance of reimbursements collected under a hospital's bad-debt policy if an Intermediary had, in accordance with the rules in effect as of August 1, 1987, accepted the hospital's collection policy before that date.  Their holdings are nonetheless instructive because the second prong of the statute also requires some assessment of "the rules in effect as of August 1, 1987."  In those cases, the two circuits concluded that the similar-collection-efforts standard in effect as of August 1, 1987, was not a rigid rule, but rather permitted providers some flexibility.

The Sixth Circuit, in <u>Detroit Receiving Hospital</u>, suggested that "after the initial enactment of the Moratorium[ in 1987], the Secretary began enforcing PRM § 310" in a more stringent manner, "and Congress sought to prevent her from doing so and to freeze the law as it existed prior to August 1, 1987." 1999 WL 970277, at *12. Hence, the Sixth Circuit explained, Congress enacted the 1988 amendment to the Moratorium, which stated "explicitly that, among the aspects of the Secretary's policy that could not be changed, were 'criteria for . . . determining whether to refer a claim to an external collection agency.'" <u>Id.</u> (citation omitted). The court ultimately concluded, as had the Eighth Circuit, that "several decisions [of the PRRB that] did not interpret PRM § 310 as a stringent requirement were in effect in 1987," and that "whether the provider sent Medicare and non-Medicare debts to collection agencies" would not necessarily determine the final outcome in the case. <u>Id.</u> at *7 (citing <u>Hennepin County Med. Ctr. v. Shalala</u>, 81 F.3d 743, 751 n.7 (8th Cir. 1996)). The Eighth Circuit, in <u>Hennepin County</u>, had noted that before August 1, 1987, "the PRRB had ruled that it was not always necessary under existing regulations to submit the accounts of Medicare patients to outside collection agencies" just because a provider sent its non-Medicare accounts to such agencies. <u>See</u> 81 F.3d at 751 n.7 (citing <u>St. Francis</u> and <u>Reed City</u>). The <u>Hennepin County</u> court stressed that "[t]he Secretary may not retroactively apply a more stringent interpretation of those existing rules." <u>Id.</u> at 751. Both Circuits thus undergirded the holding of the <u>Mountain States</u> court that "PRM § 310, although in existence on August 1, 1987, was not treated at that time as a hard and fast rule . . . [but rather] the PRRB had interpreted it as a guideline which could be set aside where sound business and financial judgments justified a provider in doing so." <u>Detroit Receiving Hosp.</u>, 1999 WL 970277, at *12.

In sum, Plaintiffs' argument about the Bad Debt Moratorium appears strong and has been endorsed by both another court in this district as well as two other circuit courts. Before fully siding with the Hospitals, however, the Court considers Defendant's various objections to this position.

B.  Defendant's Responses

Defendant raises a slew of rejoinders to Plaintiffs' contention that the Bad Debt Memorandum requires the agency to adhere to a more flexible approach to the similar-collection-efforts standard. Because these arguments are analytically distinct, the Court tackles each separately.

1.  *Deference to Agency's Interpretation*

Defendant first argues that deference to an agency's own interpretation of its guidance and regulations warrants an affirmance of the Board's decision here. See Cross-Mot. at 11. Plaintiffs respond that the Secretary is "attempt[ing] to cover a multitude of legal issues and facts in this case with a haze of deference to the agency's 'reasonable interpretation' of the regulation." Pl. Reply at 4. The deference issue, in fact, is somewhat nuanced.

To be sure, courts typically "give substantial deference to an agency's interpretation of its own regulations." Thomas Jefferson University v. Shalala, 512 U.S. 504, 512 (1994). Under this practice, an agency's interpretation of its regulations is given controlling weight "unless it is plainly erroneous or inconsistent with the regulation." Id. (quotation marks omitted) (citing Udall v. Tallman, 380 U.S. 1, 16 (1965)). The Bad Debt Moratorium complicates the deference issue, however, as it requires the Court to follow the agency's 1987 interpretation of its own regulations, rather than the agency's present-day interpretation of the same. Under the Moratorium, an otherwise "reasonable" interpretation of a bad-debt regulation, if inconsistent

23

with the Secretary's pre-1987 policy, is no longer so. And to defer to the Secretary's arguments _now_ about what the agency's policy was _then_, rather than discerning such policy from the pronouncements of the agency at that time, would have the effect of thwarting the Moratorium's central "freezing" purpose altogether. As a result, where the Moratorium governs, if the Secretary's present interpretation of a regulation is at odds with its 1987 interpretation, the current one is legally erroneous. <u>Accord</u> <u>Mountain States</u>, 128 F. Supp. 3d at 216.

2. _Regulations Pre-Date Moratorium_

Next, the Secretary asserts that both the similar-collection-efforts standard, as articulated in PRM § 310, and the reasonable-collection-efforts criterion, as codified in 42 C.F.R. § 413.89(e)(2), were in full effect on August 1, 1987. <u>See</u> Cross-Mot. at 19. Because the similar-collection-efforts standard predates the Moratorium, Defendants believe the Board's decision, which hinged on that standard, must not violate the Moratorium. Such an argument is too simplistic, for while Section 310 did exist in its present form before 1987, that fact does not end the inquiry; indeed, the pre-1987 interpretation of that guidance is the issue on which the parties disagree in this case. Plaintiffs', for instance, is that "neither [the reasonable-collection-efforts regulation] nor [PRM] § 310 requires that a provider's Medicare and non-Medicare debt collection practices be <u>identical</u>." <u>Provider-Baystate Medical Center v. Intermediary-Etna Life Insurance Co.</u>, PRRB Hearing Dec. No. 97-D90 (Aug. 4, 1997), 1996 WL 910138, at *4 (emphasis added); <u>see also</u> <u>id.</u> at *6 (noting that treating PRM § 310 as a "requirement of strictly equivalent referral policies" for non-Medicare and Medicare accounts "conflicts with 42 C.F.R. § 413.8[9](e)(2) by requiring more than a reasonable collection effort, and it contradicts [PRM] § 310 itself by going beyond the requirement therein that Medicare and non-Medicare collection efforts by merely 'similar'").

24

The question facing the Court, then, is whether the Secretary's current understanding of the regulation and the Manual is consistent with the agency's understanding of those materials in 1987, and any attempt to answer such a question requires recourse to the PRRB decisions that predate the Moratorium and reflect the agency's position at that time. This is because "[t]he Secretary's current interpretation of [Medicare] rules and guidelines is not determinative" as to whether the present interpretation was consistent with the pre-1987 policy of the Secretary. See Detroit Receiving Hosp., 1999 WL 970277, at *7. Rather, "the Secretary's policy in 1987 included both the PRM and the PRRB decisions interpreting it ([including ]St. Francis and Reed City)." Id. at *11 (internal quotation marks and citation omitted). That the Court's Moratorium analysis is informed by these PRRB decisions does not mean, contra Defendant, that it "elevate[s] those decisions above official policy statements such as PRM § 310." Cross-Mot. at 26. Rather, the Court reads them in tandem. Accord Detroit Receiving Hosp., 1999 WL 970277, at *11-12.

Defendant argues, relatedly, that "Board decisions are non-precedential and are not binding on the Secretary." Cross-Mot. at 26. That may be so, but the Court does not look to St. Francis and Reed City simply because they are PRRB decisions, but rather because they reveal the Secretary's bad-debt reimbursement policy prior to August 1, 1987. The PRRB decisions inform this Court's determination whether the Secretary's present policy is inconsistent with that policy and therefore runs afoul of the Moratorium. In implicit acknowledgment of the role of PRRB decisions in determining what policies of the Secretary were "frozen" by the Moratorium, Defendant herself cites to various PRRB decisions, and, as Plaintiffs rightly point out, she "cannot have it both ways." ECF No. 23 (Pl. Reply) at 19.

### 3. *Failure to cite* St. Francis *and* Reed City *at PRRB*

Defendant also objects that Plaintiffs rely on <u>St. Francis</u> and <u>Reed City</u> in their briefing before this Court but did not cite those decisions to the Board.  This, they argue, prevents the Court from relying on those decisions to rule on the Board's disallowance, as courts generally "will not consider arguments that have not been first presented to the agency in the administrative proceedings."  Cross-Mot. at 23 (citing <u>Pleasant Valley Hosp., Inc. v. Shalala</u>, 32 F.3d 67, 70 (4th Cir. 1994)).

First, the providers in this case point out that they <u>did</u> note that <u>St. Francis</u> and <u>Reed City</u> were relevant legal authorities and attached them as Supplemental Exhibits in their record filings. <u>See</u> Pl. Opp. and Reply at 15-16; AR 669 (Supplemental Exhibits).  Defendant proffers no reason the Hospitals may not further discuss those exhibits in their present briefings before this Court. Second, the requirement that <u>arguments</u> first be presented to an agency for its adjudication does not extend to <u>authority</u> cited in support of such arguments.  So long as the party advanced the contention before the agency – *viz.*, that the first prong of the Bad Debt Moratorium bars the Secretary's disallowance – it is free to support that contention here with whatever cases it can muster.  <u>See</u> <u>HealthEast Bethesda Lutheran Hosp. and Rehabilitation Center v. Shalala</u>, 164 F.3d 415, 418 (8th Cir. 1998) (Secretary "makes no new argument" in defense of PRRB decision where she "simply directs [the court's] attention to more particular legal support" for arguments made below).

### 4. St. Francis *and* Reed City *Explained by Litigation Prohibition*

Defendant next argues that the Board's analyses in <u>St. Francis</u> and <u>Reed City</u> were motivated not by a flexible interpretation of the similar-collection-efforts standard, but rather by a different provision of PRM § 310.  <u>See</u> Cross-Mot. at 21-22.  An earlier version of Section 310

– rescinded in 1983 – included a prohibition on threatening to take or taking court action in an effort to collect Medicare bad debts. The Secretary contends that the Board in <u>St. Francis</u> and <u>Reed City</u> reached the outcomes it did by relying on that now-rescinded provision, rather than by interpreting Section 310 to permit some exceptions to its similar-collection-efforts requirement.

The pre-1983 prohibition on the threat of litigation to recover Medicare bad debt explained:

> It is not the intent of the Medicare bad debt principle that court action be threatened or taken before these uncollected amounts can be reimbursed under this principle. The provider should instruct the collection agency not to use, or threaten to use, court action to collect the Medicare deductible and coinsurance amounts. However, where a collection agency refuses to accept Medicare accounts under the above Medicare restriction on legal action . . . [,] referral of unpaid Medicare deductible and coinsurance amounts is not required. Where referral to a collection agency is not made because of either of these restrictions, this does not, however, relieve the provider of responsibility to put forth a reasonable collection effort . . . .

Def. Exh. 2 (1981 PRM § 310) at 2. This paragraph was rescinded well before the Bad Debt Moratorium took effect but was still in place for the years whose reimbursement was at issue in <u>St. Francis</u> and <u>Reed City</u>. The amended version of Section 310 – without the litigation prohibition – included the language that "[t]he provider's collection effort may include using or threatening to use court action to obtain payment" and that "[w]here a collection agency is used, the agency's practices may include using or threatening to use court action to obtain payment." Def. Exh. 1 (1983 PRM § 310 Amendments) at 2-3 (changes effective for cost-reporting periods beginning on or after January 15, 1983); <u>see also</u> <u>St. Francis</u> at 1 (noting that PRRB decision concerned "cost reporting period[,] ending May 31, 1980, 1981, 1982, 1983"); <u>Reed City</u> at 1 (noting that PRRB decision concerned "cost reporting period ending June 30, 1982").

Defendant believes that when the prohibition on court action and threats of court action was part of Section 310, providers might decline to send Medicare accounts to collection agencies for fear that the agencies' collection practices would include threats of or actual litigation. She hypothesizes that the Board allowed reimbursement in those cases because it found the dissimilar use of collection agencies justified in light of the litigation prohibition. Defendant thus insists that, absent the prohibition on threats of or actual litigation, any exception to the similar-collection-efforts rule is no longer appropriate.

This argument, in the Court's view, cannot sustain the explanatory weight the Secretary would like it to carry. Crucially, neither St. Francis nor Reed City mentions the 1981 prohibition on threats of litigation, nor does either PRRB decision discuss the practice of some collection agencies of threatening to take or taking court action to collect non-Medicare debts. Faced with the same argument – that the litigation prohibition, rather than a flexible approach to the similar-collection-efforts standard, motivated the decisions in St. Francis and Reed City – the Mountain States court explained:

> In Reed City. . . [t]he provider made no reference to the ban on threats of litigation, instead relying exclusively on the asserted indigency of the relevant population, . . . [and] the Board's analysis in Reed City makes no mention of the restriction on legal action . . . merely f[inding] that "the provider's collection policies reflect that it maintained reasonable collection efforts on Medicare accounts deemed uncollectible as required" by the regulations. . . . Likewise, there is no evidence that the St. Francis decision was based, even in part, on the prohibition of the threat of legal action against Medicare beneficiaries. . . . Without making any reference to the prohibition on the threat of litigation, the Board found the provider's efforts met "the reasonable effort requirements" [and explained] . . . that "it is reasonable to write off bad debts when their pursuit would be too costly."

128 F. Supp. 3d at 217-18 (internal citations and alterations omitted).

The Court concurs. Like Judge Moss, this Court cannot infer, particularly absent any reference to the bar on threats of or actual litigation, that such prohibition motivated the Board's decisions in those cases. Indeed, a far more plausible explanation was actually offered by the Board: The PRRB expressly noted in both decisions that the providers had demonstrated that they had employed reasonable collection efforts for their Medicare accounts via in-house attempts to recover outstanding payments and had determined, based on prior experience, that these Medicare accounts yielded little to no recovery when sent for further collection efforts to a collection agency, likely because of the demographics of the Medicare patients.

Even Defendant does not seem convinced by her alternative interpretation of these decisions. Rather than firmly asserting that the now-rescinded litigation prohibition in Section 310 explains the outcomes in St. Francis and Reed City, the Secretary merely suggests that "[i]t is equally plausible that the Board [in St. Francis] determined, under the 1981 version of PRM § 310, that the litigation exception applied," and "it is entirely possible that the intermediary [in Reed City] . . . erroneously asserted that the [litigation] exception did not apply." Cross-Mot. at 24-25. Just as the Mountain States court remained unpersuaded that the litigation prohibition explained the decisions in St. Francis and Reed City, so, too, will this Court reject this line of argument.

Notwithstanding the absence of discussion of the earlier version of Section 310 in those two decisions, Defendant points to two other Board decisions that, in her estimation, demonstrate that the Secretary's pre-Moratorium flexible application of the similar-collection-efforts standard is attributable to the now-repealed prohibition on threats of litigation. The first is Davie County Hosp. v. Blue Cross & Blue Shield Assoc., PRRB Hearing Dec. No. 84-D89 (Mar. 22, 1984), in which the Board concluded that the provider had not satisfied the similar-collection-efforts

29

standard where it failed to refer Medicare overdue accounts to a collection agency <u>or</u> to make

"comparable in-house telephone or letter writing efforts to collect the accounts before claiming

them as bad debts." Def. Exh. 3 (<u>Davie County</u>) at 1. <u>Davie County</u> is inapposite, however,

because although the providers there did argue that the litigation prohibition justified their

decision to send only non-Medicare debts to collection agencies, the Board did not dwell on that

argument because the provider failed in the first instance to take <u>any</u> reasonable efforts to collect

Medicare debts. The Board did not dispute that sending unpaid Medicare accounts to a

collection agency might have been improper, but instead determined that in lieu of referring such

accounts to an agency, "a provider might use other in-house collection efforts such as writing

letters and making telephone calls. Since it did not use . . . an acceptable alternative to referral to

a collection agency, the Board finds that the provider has not demonstrated that it under-took any

reasonable collection effort." <u>Id.</u> The Board's decision to disallow Medicare reimbursement in

<u>Davie County</u>, then, rested not on the provider's failure to refer Medicare accounts to a

collection agency but on its failure to undertake <u>any</u> meaningful collection efforts – either via in-

house collection procedures or agency-driven collection efforts. In fact, the decision leaves open

the possibility that had the hospital employed genuine in-house efforts, such as writing letters

and making telephone calls, to collect unpaid Medicare accounts, such efforts might have

satisfied Section 310 even if the hospital sent only non-Medicare accounts to a collection agency.

<u>Davie County</u>, then, does not undermine the Court's conclusion that CMS applied the similar-

collection-efforts standard flexibly prior to the enactment of the Bad Debt Moratorium.

The other PRRB Decision on which Defendant principally relies for her litigation-

prohibition argument is <u>Marian Health Center v. Blue Cross & Blue Shield Assoc.</u>, PRRB

Hearing Dec. No. 85-D110 (Sept. 23, 1985) (attached as Def. Exh. 4). There, the Board

determined that a provider's "multi-step in-house [collection] procedure – including numerous billings, personal contacts, and personal letters – for 180 days for all accounts" may have been sufficient to constitute reasonable collection efforts, even if only non-Medicare accounts were later sent to a collection agency. See Def. Exh. 4 (Marian Health Center) at 1. In that case, however, the Board disallowed reimbursement for various Medicare accounts where the provider had not demonstrated that it made reasonable collection efforts, had not adequately documented its collection efforts, and may not have followed its written collection procedures for each account. See id. At the same time, the Board did not reject the provider's argument that although it did not turn over all its Medicare accounts to private collection agencies, it determined to write off those accounts based on "sound business decisions that most of such accounts were just patently uncollectible, particularly absent the creditor's option to sue or threaten legal action." Id. In Marian Health Center, as in Davie County, the provider thus expressly invoked Section 310's prior prohibition on threatening legal action as a justification for sending only non-Medicare accounts to a collection agency, and the Board disallowed the provider's Medicare reimbursements for other reasons. Neither case, accordingly, stands for the proposition that Plaintiffs' interpretation of St. Francis or Reed City is incorrect, and neither is factually similar enough to this one to require the conclusion that the Board's disallowance here was appropriate.

Finally, the Court would be remiss not to note that both Davie County and Marian Health Center are Board decisions issued with cursory "Conclusions and Findings" of less than a page, and such conclusions were reached without much explanation or analysis. The decisions, as a result, are of only limited value in ascertaining the Secretary's policy in 1987, at least as to the questions posed by this case.

Defendant's last rejoinder is that the Secretary's post-Moratorium guidance clarifying the agency's pre-Moratorium policies is the authoritative guide for the principles "frozen" in place by the Moratorium. <u>See</u> Cross-Mot at 20-21. Specifically, Defendant points to the "HCFA Clarification on Bad Debt Policy," a memorandum to regulatory advisors dated June 11, 1990. <u>See</u> AR 471-73 (HCFA Clarification). The HCFA Clarification, according to the Secretary, makes clear that the agency's pre-1987 interpretation of Section 310 required identical collection efforts and identical use of collection agencies. <u>See id.</u> at 20. In her view, this document trumps any other argument about the agency's pre-1987 policy. <u>See id.</u>

The HCFA Clarification was "an attempt to reduce the frequency with which providers may [have] be[en] prematurely designating bad debts as 'uncollectible' merely because they have been turned over to a collection agency." HCFA Clarification at 1 (AR 471). The guidance focused primarily on "the point in the collection effort at which a provider may claim a Medicare bad debt" and was "prompted by the moratorium." <u>Id.</u> But the thrust of its focus was Section 310.2 of the PRM, titled "Presumption of Noncollectibility," under which a debt "may" be deemed uncollectible after 120 days of reasonable efforts to collect it. The HCFA Clarification stressed the word "may" in that instruction, in order to explain that the section's presumption of noncollectibility after 120 days was not, in fact, a rigid rule. <u>See id.</u> at 2 (AR 472). This guidance, Defendant maintains, "was designed to explain what the agency's bad debt policy had been prior to August 1, 1987, and thus what the agency's policy continued to be" after the enactment of the Bad Debt Moratorium. <u>See</u> Cross-Mot. at 21.

The difficulty is that the Secretary does not explain, first, why guidance issued by the agency in 1990 should be more authoritative as to its pre-1987 policies than pre-1987 Board

decisions. Nor does she explain why the HCFA Clarification precludes a flexible application of the similar-collection-efforts standard. The Court is not so sure that it does. The memo explains:

> We believe that an intermediary could reasonably have interpreted the title of section 310.2, Presumption of Noncollectibility, to provide that an uncollectible [Medicare] account could be <u>presumed</u> to be a bad debt if the provider has made a reasonable and customary attempt to collect the bill for at least 120 days <u>even though</u> the claim has been referred to a collection agency. Such an interpretation is reasonable unless it is apparent that the debt is not a bad debt, for example, because the beneficiary is currently making payments on account, or has currently promised to pay the debt. . . . . Thus, even after 120 days, a debt should not be deemed uncollectible when there is reason to believe that in fact it is collectible. However, the mere fact that a [Medicare] debt is referred to a collection agency after the provider's in-house collection effort is completed does not mean that the debt is collectible.

HCFA Clarification (AR 472). The Clarification at most seems to suggest that whether a provider may reasonably send only non-Medicare accounts to a collection agency after the provider's in-house collection effort is a fact-dependent determination at the discretion of the Intermediary and, ultimately, the Board. Such a suggestion is not at odds with the Court's holding here – that the similar-collection-efforts rule is not a completely inflexible one – and, in fact, seems to support it. In any event, the Court does not believe that Defendant has adequately demonstrated that the HCFA Clarification can or does reveal that the Secretary's pre-1987 policy was to require identical collection efforts and identical use of collection agencies in order for a provider's efforts to qualify as "similar" and, therefore, reasonable.

*     *     *

In sum, having found none of Defendant's counterarguments meritorious, the Court joins Judge Moss and the Sixth and Eighth Circuits. It concludes that the Secretary's rigid application of Section 310's similar-collection-efforts standard violates the Bad Debt Moratorium's prohibition on alterations to the Secretary's bad-debt policies after August 1, 1987. The Board's

finding "that the dissimilar use of the SCA for non-Medicare versus Medicare patient accounts violates PRM [] 310" is therefore not supported by the legal and factual record.  <u>See</u> PRRB Dec. at 10.

C.  <u>Failure to Follow Provider Policy</u>

Defendant has a fallback position.  It contends that, regardless of whether the agency's decision here violated the Bad Debt Moratorium, the Hospitals should not be reimbursed for the disallowed amounts because they did not follow their own written collection policy, which arguably required them to send all accounts to a secondary collection agency.  The primary difficulty with such a position, however, is that Defendant offers scant authority for the proposition that failure to follow one's policy necessarily results in disallowance of reimbursement.

In support of her argument, the Secretary cites a single PRRB decision, <u>Methodist Hospital of McKenzie v. Blue Cross & Blue Shield Ass'n</u>, PRRB Hearing Decision No. 99-D71, 1999 WL 973646 (Sept. 30, 1999).  In that case, the provider, a hospital-based home-health agency, had recently adopted a policy that required it to document its specific collection efforts for accounts written off in less than 120 days, and to "demonstrate that the debt was actually uncollectible." <u>Id.</u> at *14 (emphasis and internal quotation marks omitted).  The Intermediary disallowed the Medicare debts the provider had written off in less than 120 days, declaring that the presumption of uncollectibility was not available for such debts.  <u>Id.</u>  The Intermediary further noted that, because the presumption did not apply, the provider was required to submit documentation indicating that the debts written off before that time were "actually uncollectible" within the meaning of the bad-debt regulation.  <u>See id.</u> at *13-14; <u>see also</u> 42 C.F.R. § 413.89(e)(3) (Medicare bad debts must be "actually uncollectible" for CMS to reimburse

34

them).  The Intermediary's disallowance decision was therefore based only on a lack of evidence that the Medicare bad debts were "actually uncollectible," not on any argument about the Bad Debt Moratorium or the provider's own collection policies and whether those policies were followed.

The Board, reviewing the Intermediary's decision, agreed that "there was no evidence in the record to demonstrate why 11 of 32 accounts were actually uncollectible and written off in less than 120 days."  Methodist Hosp., 1999 WL 973646, at *14.  The PRRB decision also includes the following two sentences at the end of its review of the bad-debt disallowances: "The Board also addresses the Provider's argument that a statutory moratorium on changes in bad debt collection policy precludes the Intermediary's disallowance.  The Board concludes that since the Provider did not follow its own bad debt collection policies, the issue is moot."  Id.  The PRRB cited no other authority for this proposition, nor did it provide any reason why a provider's failure to follow its own policies renders "moot" the question of whether the Bad Debt Moratorium precludes the Secretary's disallowance.  Defendant, it is worth noting, also offers no other authority or analysis in support of this notion, choosing to hang her hat entirely on the aforementioned unadorned sentences in this single PRRB decision.

In part because of this absence of explanation from the Board in Methodist Hosp., and because the Intermediary below in that case did not rely on any such argument in making its disallowance determination, the Court is not persuaded that the decision stands for such a broad proposition.  Rather, the Court believes a better inference is that the Board took the provider's change in its policy – from not requiring documentation of collection efforts made on debts written off before 120 days to expressly requiring such documentation – as recognition from the provider that the Intermediary's argument was correct.  In other words, since the presumption of

uncollectibility does not apply to debts written off before 120 days, providers must demonstrate, with documentation, that they were written off because they were "actually uncollectible" within the meaning of 42 C.F.R. 413.89(e)(3). The Court thus concurs with Plaintiffs that "there was no real difference between what the provider's [new] policy stated and what the regulation required," Pl. Opp. at 22 n.9, and the Board in <u>Methodist Hosp.</u> may very well have taken the provider's updated policy as simply indicating that it was familiar with that regulatory requirement. And because Defendant offers no additional argument or authority – other than the unreasoned assertion in <u>Methodist Hosp.</u> – in support of its fallback position, the Court cannot conclude that a provider's failure to follow its own written policy renders <u>any</u> other argument it may have in favor of reimbursement irrelevant. <u>Cf.</u> <u>Detroit Receiving Hosp.</u>, 1999 WL 970277, at *10.

Plaintiffs argue, in the alternative, that even if the Medicare regulations do require disallowance where a provider has not followed its own policy, the Secretary here has not established that the Hospitals did not do so. During the hearings before the PRRB, a representative of the Hospitals testified that their policy stated, "If no action is taken[ after OCAs return debts to the Hospitals as uncollectible,] the system will generate a 978 adjustment for all non-Medicare accounts, 985 for Medicare accounts, and transmit the account to the secondary collection agency." PRRB Dec. at 10; <u>see also</u> AR 224 (original testimony). This implies that <u>all</u> accounts are to be transmitted to the secondary collection agency, Defendants insist, and the Hospitals' failure to do so constitutes "[a]n independent basis for upholding the disallowance." Cross-Mot. at 30. Plaintiffs, on the other hand, contend that their policy was ambiguous, and that they had, for a long time, maintained a practice distinct from the understanding of the written policy that Defendant endorses. <u>See</u> Pl. Opp. at 21-23. They offered substantial

testimony in their hearing before the Board about how the Hospitals themselves understood their policy to operate.  See AR 216-17 (testimony of HMA employee noting that the "policy and procedure" of the Hospitals from the time she began working in 1990 was to send only non-Medicare accounts to a secondary collection agency after they were written off, and that another employee had confirmed that this was the Hospitals' policy at least dating back to 1985).  The PRRB Decision does not discuss such testimony, however, so the Court cannot know what findings of fact or conclusions of law were drawn from it.  It does seem, however, that the Hospitals have a colorable argument that they did comply with their own longstanding debt-collection policies.

In any event, the Board here did not rule or rely on the fallback contention Defendant now raises.  Nowhere did it conclude that a provider's failure to follow its own policy automatically renders reimbursement impossible or "moots" the Bad-Debt-Moratorium issue.  The Court, accordingly, declines to endorse a position introduced for the first time at this stage in the litigation.  See Pleasant Valley Hosp., 32 F.3d at 70.

D.  Remedy

The Court's conclusion that the Secretary's pre-1987 policy interpreted Section 310's similar-collection-efforts standard as somewhat flexible means that reimbursement may be appropriate even where a provider has not treated Medicare and non-Medicare accounts in an identical fashion – what the Mountain States court called "occasional exceptions."  128 F. Supp. 3d at 220.  The existence of such exceptions, however, "does not mean Plaintiff[s] ha[ve] demonstrated [their] entitlement to such an exception" here.  See id. (emphasis added).  The Court thus arrives at the final question in this case: Are Plaintiffs entitled as a matter of law to

such an exception on this administrative record, or is remand required for further Board proceedings?

Here, too, the decision in <u>Mountain States</u> is instructive. As Judge Moss explained, "[E]ven under the standard applied in the <u>Reed City</u> and <u>St. Francis</u> decisions, it was the provider's burden to present evidence that the continued 'pursuit' of Medicare bad debt would 'be too costly,'" and that, consequently, continued collection efforts for non-Medicare accounts only was the reasonable course of action. <u>Id.</u> (quotation marks and citation omitted) (quoting <u>St. Francis</u>). The court noted that evidence in the administrative record indicated that for the providers there, "the recovery rate for Medicare accounts at secondary collections level 'may be equal to or slightly higher than the non-Medicare' recovery rate." <u>Id.</u> at 221. The court, moreover, found compelling the Secretary's argument that "Plaintiff relies [solely] on generalizations about Medicare accounts as a group and did not provide sufficient information to establish that the collection rate attributed to the Providers' Medicare accounts represented the collection rate for Medicare accounts that were <u>similar in amount</u> to the non-Medicare accounts referred to secondary collection agencies." <u>Id.</u> (internal quotation marks omitted). It ultimately concluded that the evidence in the record was insufficient for a determination of whether the providers' collections procedure did or did not constitute an "occasional exception" to PRM § 310. Judge Moss therefore remanded for the Board itself to determine whether such an exception covered the providers in that case.

This Court is now in the same position. The Board here found that "the Providers treated Medicare accounts and non-Medicare accounts in a similar manner during in-house and primary collection agency efforts." PRRB Dec. at 9. It also suggested that "the Providers' decision to send only non-Medicare bad debts to the SCA may have been above and beyond the minimum

needed to establish a 'reasonable collection effort.'" Id. at 16.  But Plaintiffs do not point to any evidence in the record indicating that sending Medicare accounts to SCAs after those primary collection efforts ended would have been more costly than it was worth and therefore would not have been a sound business decision.

The record established that the SCA activities resulted in payments in 3.5 to 6.5 percent of non-Medicare accounts sent to the SCA.  Id.  Yet the record does not establish that Medicare accounts would yield payments at a significantly lower rate.  The Hospitals, furthermore, seem to rely primarily on generalizations about the Medicare population in explaining their decision not to send those accounts to the SCA, much like the Mountain States providers.  See id. at 7 ("The Providers maintain that, while they sent their unpaid non-Medicare accounts to the SCA, they believed that, based on sound business judgment, these accounts were uncollectible and there was no likelihood of collecting them in the future.").  What Plaintiffs' purportedly "sound business judgment" is based on is not apparent, either from the parties' briefings or the administrative record.

The Court, therefore, cannot assess whether Plaintiffs' judgment was reasonable in light of the facts of this case and, accordingly, whether an "occasional exception" to the Section 310 standard is warranted here.  Based on this administrative record, the Court will therefore allow the Board to determine, in the first instance, whether the Hospitals did, in fact, have sound business reasons for not sending their Medicare accounts to SCAs.  Accord Foothill Hosp., 558 F. Supp. 2d at 11 (vacating and remanding after concluding that PRRB decision "constitutes a change in policy in violation of the Bad Debt Moratorium").

 On remand, the Board should determine whether the Hospitals' belief that the recovery rates for Medicare accounts would be less than those for similar-value non-Medicare accounts

sent to SCAs was supported by evidence beyond mere assumptions about Medicare patients as a group.  St. Francis and Reed City, moreover, should assist in framing the issues.  In Reed City, for instance, the provider represented to the Board that it "did not submit the Medicare uncollectibles to the collection agency because its recovery rate would have been negligible due to the highly indigent population of its service area.  Further, since the Intermediary audit, the provider [began] forwarding its delinquent Medicare patient accounts to the collection agency with virtually insignificant results."  Reed City at 2.  The Board found that in light of this, and because the provider's in-house collection efforts were "acceptable and appropriate," the Medicare bad debts were reimbursable notwithstanding the provider's differential treatment of the two kinds of accounts.  Id. at 3-4.  In St. Francis, similarly, the provider referred its Medicare and non-Medicare accounts to a collection agency after its in-house collection efforts, but had little success with the Medicare accounts.  See St. Francis at 1 (noting that "no amounts were recovered from the Medicare beneficiaries for the 1983 fiscal year").  The Board found that this experiment was sufficient to "demonstrate[] that writing off bad debts when their pursuit would be too costly was a reasonable practice," and because "the provider's in-house collection efforts constituted a reasonable collection effort," the Medicare bad debts could be reimbursed.  Id. at 1-2.

In both cases, therefore, the Board found that an exception to the similar-collection-efforts standard in Section 310 was appropriate where the provider had demonstrated that its primary collection efforts were adequate and similar among all kinds of accounts, and that using a collection agency for Medicare accounts after such efforts would yield little or no additional recovery.  Of course, these are not the only cases that establish the circumstances under which sound business judgment might reasonably counsel against employing identical collection efforts

for Medicare and non-Medicare accounts; other PRRB decisions before August 1, 1987, may offer additional guidance for the Board on remand.  Should the Board ultimately find insufficient evidence to support the Hospitals' claim that their decision to send only non-Medicare accounts to a secondary collection agency was supported by "sound business judgment," it may again affirm the Intermediary's disallowances.  On the other hand, if Plaintiffs can demonstrate, on remand, that their decision was reasonable and supported by their experience with Medicare bad-debt collection, the similar-collection-efforts standard should not bar reimbursement.

**IV.    Conclusion**

For the foregoing reasons, the Court will deny Defendant's Cross-Motion for Summary Judgment, grant in part Plaintiffs' Motion for Summary Judgment, vacate the decision of the PRRB, and remand for proceedings consistent with this Opinion.


/s/ James E. Boasberg
JAMES E. BOASBERG
United States District Judge

Date:  July 25, 2016